## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

MICHAEL LAURSEN, *on behalf of himself and all individuals similarly situated*,

                              Plaintiff,

        v.

GENERAL MOTORS, LLC and ONSTAR, LLC,

                              Defendants.

Case No. 2:24-cv-11153

**CLASS ACTION**

**JURY TRIAL DEMANDED**

## CLASS ACTION COMPLAINT

Plaintiff Michael Laursen, on behalf of himself and all others similarly situated, brings this action against General Motors, LLC ("GM"), and OnStar, LLC ("OnStar") (collectively "Defendants"). The following allegations are based on Plaintiff's knowledge, investigations of counsel, facts of public record, and information and belief.

## SUMMARY OF THE CASE

1.      This case arises out of GM and its subsidiary software company OnStar's surreptitious collection of customers', including Plaintiff's driving telematics data (including acceleration events, hard brake events, high speed events, distance, and VIN) and their sharing and/or sale of that data to third parties to

compile reports used by auto insurance companies to set rates and premiums, all without the customers' knowledge or consent.

2. OnStar ostensibly provides WiFi and the ability to locate a car for emergency services in case of an accident, but customers were not aware it was tracking data points about their driving stripped of all context for reports used by their auto insurers to justify a raise in their rates.

3. Usage-based insurance plans, in which an auto insurance company directly obtains telematics data through an onboard device or a mobile application, are increasingly common. However, here, GM and OnStar customers like Plaintiff and Class Members did not have such an insurance plan, but their private telematics data was still collected and provided to insurance companies.

4. The GM and OnStar agreements fail to adequately disclose that the companies collect and share and/or sell customers' driving data with third parties. At best, the disclosures that do exist are inadequate to inform customers of those practices or to obtain their consent.

5. GM and OnStar deliberately buried the true function of the OnStar product, because such tracking and selling of data is enormously unpopular with GM customers and the general public.

6. Then, on March 22, 2024, following a New York Times article about the practice published on March 11, 2024, and at least one lawsuit, GM announced

that two days previously it had stopped the practice of sharing driving telematics data with third party data brokers LexisNexis Risk Solutions and Verisk, a program that included more than 8 million vehicles. This suggests an acknowledgement by Defendants that they in fact did not have the requisite legal consent by their customers for this data sharing practice. However, Plaintiff and the putative Class Members have damages from when Defendants carried out this practice.

7.      Plaintiff and Class Members bring claims against Defendants for common law invasion of privacy and deceptive and unfair practices under the Michigan Consumer Protection Act, Mich. Comp. Laws Ann. §§ 445.903 *et seq.*

## JURISDICTION AND VENUE

8.      The Court has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1332(d). The amount in controversy exceeds the sum of $5,000,000 exclusive of interest and costs, there are more than 100 putative class members, and minimal diversity exists because many putative class members are citizens of different states than Defendants.

9.      The Court has personal jurisdiction over GM and OnStar as their headquarters and principal places of business are in Detroit, Michigan**.**

10.     Venue is proper in this District under 28 U.S.C. §§ 1391(a)(2), 1391(b)(2), and 1391(c)(2) because substantial part of the events giving rise to the

claims emanated from activities within this District, and Defendants conduct substantial business in this District.

## **PARTIES**

11.     Plaintiff is, and at all relevant times has been, a resident and citizen of Michigan, where he intends to remain.

12.     Defendant GM is a limited liability company organized under the laws of Delaware, with its headquarters and principal place of business located in Detroit, Michigan. GM is an American multinational automotive manufacturing company that owns automobile brands including Chevrolet, GMC, Cadillac and Buick, and sells cars throughout the United States and internationally.

13.     Defendant OnStar is a limited liability company organized under the laws of Delaware, with its headquarters and principal place of business located in Detroit, Michigan. OnStar is a subsidiary of GM that provides subscription-based communications, in-vehicle security, emergency services, turn-by-turn navigation, remote diagnostics systems and information services throughout the United States and internationally.

## **FACTUAL ALLEGATIONS**

### **A. GM has a history of collecting drivers' information.**

14.     GM was founded in 1908 and, as of 2023, was the largest automaker in

the United States by sales.[1] Indeed, GM was the largest automaker in the *world* for more than 76 years.[2] GM's brands—Buick, Cadillac, Chevrolet and GMC—are household names. For the bulk of GM's existence as a juggernaut in the American marketplace, the corporation dealt in one major area: cars.

15.    In 1996, however, GM entered the information economy with the launch of OnStar, the name for an ever-growing suite of information services GM provides to drivers through the corporation's subsidiary of the same name.[3] In launching OnStar, GM was the first automaker to bring "connected car" features to market.[4] A "connected car" is one containing devices that *connect* to other devices within or outside of the car through internet networks and Bluetooth.[5] GM made OnStar, in collaboration with Motorola Automotive, at a time when cellular voice connections were not reliable.[6] OnStar was advertised as a safety product that

---

[1] Mathilde Carlier, *Estimated U.S. market share held by selected automotive manufacturers in 2023*, Statista (Mar. 11, 2024), https://www.statista.com/statistics /249375/us-market-share-of-selected-automobile-manufacturers (last accessed Apr. 30, 2024).

[2] Nick Bunkley, *Toyota Ahead of G.M. in 2008 Sales*, The New York Times (Jan. 21, 2009), https://www.nytimes.com/2009/01/22/business/22auto.html (last accessed Apr. 30, 2024).

[3] *Definition of Connected Car – What is the connected car? Defined*, Auto Connected Car News (Apr. 22, 2014), archived at https://web.archive.org/web/20230903042010/https://www.autoconnectedcar.com/ definition-of-connected-car-what-is-the-connected-car-defined/ (last accessed Apr. 30, 2024).

[4] *Id.*

[5] *Id.*

[6] *Id.*

utilized a "telematics system" (long-distance transmission of computerized information) to connect drivers making voice calls to a call center that contacted emergency responders in the case of accidents when an airbag was deployed.[7]

16.    Over time, GM's developed OnStar to include a growing range of features that collected information from driver's and their GM-brand cars. OnStar's original safety features were soon appended with GPS location services and the ability to transmit voice and other data at the same time.[8] In 2001, remote diagnostic capabilities were introduced, which allowed for drivers' car issues to be diagnosed by experts from a distance.[9] GM added vehicle health reports, turn-by-turn directions, and a network access device in 2003.[10] By 2014, GM had deployed 4G LTE *en masse*, connecting drivers to high-speed internet virtually anywhere.[11] One year later—in 2015—OnStar had processed 1 billion requests from customers.[12] In 2020, General Motors reached 1 million OnStar WiFi subscriptions.[13]

17.    In addition, GM has provided information services and collected driver

---

[7] *Id*.

[8] *Id*.

[9] *Id*.

[10] *Id*.

[11] *Id*.

[12] *Id*.

[13] Sam McEachern, *General Motors Reaches 1 Million OnStar Wi-Fi Subscriptions Milestone*, GM Authority (Oct. 20, 2020), https://gmauthority.com/blog/2020/10/general-motors-reaches-1-million-onstar-wi-fi-subscriptions-milestone/#google_vignette (last accessed Apr. 30, 2024).

data through drivers' *cell phones*, separate from the car product. In 2010, GM launched OnStar-capable mobile apps specific to each of its four brands—the myBuick, myCadillac, myChevrolet, myGMC Mobile Apps.[14] In 2021, GM made the OnStar Guardian App available to any driver in the United States.[15] The Guardian app uses sensors in the phone, such as the accelerometer and the GPS receiver, to provide some traditional OnStar services (e.g., automatic crash notification), regardless of the vehicle in which the user is riding.[16]

18.     Of course, the connected car is a two-way street. What GM customers gain in connectivity, GM gains in highly personal data.

**B.   GM is profit-motivated to collect driver data by enrolling customers in its information services, including OnStar.**

19.     Because GM can benefit from sharing driver data with third-party data brokers, GM is motivated to enroll drivers in its information services even when customers have not consented. According to a 2015 industry analysis of the connected car market, one of the "barriers" to the market success of the connected

---

[14] Jake Holmes, *GM to Launch Brand-Specific OnStar Mobile Apps for Android and iPhone*, Car and Driver (Jul. 23, 2010), https://www.caranddriver.com/news/a18736585/gm-to-launch-brand-specific-onstar-mobile-apps-for-android-and-iphone/ (last accessed Apr. 30, 2024).
[15] Jamie L. LaReau, *GM offers OnStar service to drivers of any vehicle in US, Canada*, Detroit Free Press (June 7, 2021), https://www.freep.com/story/money/general-motors/2021/06/07/onstar-guardian-app-gm-cars/7546541002/ (last visited Apr. 30, 2024).
[16] *Id.*

car in the past few years is the fact that "customers are reluctant to pay the extra costs associated with embedded connectivity and instead use their smartphones as a solution for their in-car connectivity needs."[17] The authors of the analysis note that this reluctance by customers to pay for connected information services is likely to continue in the short term and noted that car manufacturer are "turning to smartphone integration in an effort to satisfy customer demand for connectivity . . ."[18] By bombarding drivers with information services in their cars *and* on their phones, GM and OnStar have made it likely that drivers will unknowingly enroll in a data collecting, information service. As a result, GM and OnStar have effectively done away with customer choice entirely.

20.    For example, in 2022, GM forced customers to pay for a three-year "OnStar and Connected Services Premium Plan" by including the cost of the service in the manufacturer's suggested retail price on some of its vehicles, even if customers did not want to use the subscription service.[19] A GM spokesperson acknowledged the default option, stating that "[b]y including this plan as standard

---

[17] everis.com, *everis Connected Car Report*, archived at https://web.archive.org/web/20150518075603/http:/www.everis.com/global/WCRepositoryFiles/everis%20connected%20car%20report.pdf (last accessed Apr. 30, 2024).

[18] *Id*.

[19] Kalea Hall, *GM makes OnStar, connected services plan standard on some vehicles*, The Detroit News (Aug. 9, 2022), https://www.detroitnews.com/story/business/autos/general-motors/2022/08/09/gm-makes-onstar-connected-services-plan-standard-some-vehicles/10278523002/ (last accessed Apr. 30, 2024).

equipment on the vehicle, it helps to provide a more seamless onboarding experience and more customer value."[20]

## C. Insurance companies make use of the driver data generated and collected by GM through OnStar.

21.    The data provided by greater vehicle connectivity is impacting the car insurance industry.[21] Predictive-modeling and machine-learning technologies, as well as real-time data streaming, providing information on driving speed, routes and time, are changing how insurers do business.[22] Early adopters have begun to adjust their offering to the developments in the automotive industry, leading them to transition from being pure insurance product providers to becoming insurance-service hybrids, that depend on driver data collected from customers.[23]

22.    For example, one large insurance company introduced its usage-based-insurance program, Snapshot, in 2008, which takes into account driving times and ability.[24] The data gathered through an onboard diagnostics device—a self-

---

[20] *Id.*

[21] Andreas Harbeck, et al., *Connected car, automotive value chain unbound*, McKinsey & Co. (Sept. 2014), archived at https://web.archive.org/web/20170421101141/https://www.mckinsey.de/files/mck_connected_car_report.pdf (last accessed Apr. 30, 2024).

[22] *Id. See also* Markus Löffler, et al., *Shifting gears: Insurers adjust for connected-car ecosystems*, McKinsey & Co. (May 20, 2016), https://www.mckinsey.com/capabilities/mckinsey-digital/our-insights/shifting-gears-insurers-adjust-for-connected-car-ecosystems (last accessed Apr. 30, 2024).

[23] *Id.*

[24] Progressive Casualty Insurance Co., *Get Snapshot from Progressive*, https://www.progressive.com/auto/discounts/snapshot/ (last accessed Apr. 30, 2024).

diagnostic and reporting capable device—allows the insurance company to perform further personal and regional risk assessments.[25] Another innovation being tested in the insurance industry regards telematics devices, which transmit vehicle and driver data through wide-area networks and are subsequently used to, *inter alia*, create driver risk profiles.[26] Indeed, as detailed by the New York Times on March 11, 2024 in an article about these practice by Defendants, insurance companies admit they have relied on driver data to raise the cost of car insurance or deny coverage altogether.[27] Further, at least some of the driver data that insurers use to price their products come from data brokers who received the data from GM and OnStar themselves.[28]

### D. Customers did not consent and would never consent to GM and OnStar tracking their driving data and sharing and/or selling it to third parties.

23.     Defendants worked together to profit from customers' driving telematics data, including Plaintiff's, without their express consent. GM collected customers' driving telematics data by equipping customers' cars with OnStar capabilities and/or providing OnStar connected services through either the OnStar

---

[25] *Supra* n.22.

[26] *Id.*

[27] Kashmir Hill, *Automakers Are Sharing Consumers' Driving Behavior With Insurance Companies*, The New York Times (Mar. 11, 2024), https://www.nytimes.com/2024/03/11/technology/carmakers-driver-tracking-insurance.html (last accessed Apr. 30, 2024).

[28] *Id.*

Guardian App or GM-branded apps, such as, for example, the myChevrolet App. GM and OnStar makes its "connected services"—and accompanying data collecting practices—nearly unavoidable for customers.

24.     GM and OnStar ensure that customers' cars are "connected"—that is, capable of data harvesting—in one of two ways. One, GM cars are installed with OnStar-capable hardware and software, making the transmission of customers' telematics driving data the default. Moreover, GM and OnStar advertise the safety and convenience features of the OnStar Guardian App and/or GM-branded apps, such as the myChevrolet App, but obfuscate the true nature of the connected services that flow from customers' use of the mobile apps.

25.     Ostensibly, GM and OnStar coordinate to make its default data harvesting part of the back drop in a manner that avoids raising customers' attention because such practices are, at best, unpopular amongst drivers[29] and, at worst, repugnant to them.[30] Drivers are often unaware that their driving data is being

---

[29] Susan Meyer, *Gen Z doesn't want to share data with auto insurance companies, but Millennials do*, The Zebra (updated Mar. 12, 2024), https://www.thezebra.com/ resources/driving/telematics-driver-survey/ (last accessed Apr. 30, 2024) (finding majority of Americans do not want to share their driving data with insurance companies).

[30] *See* Hill, *supra* n.27 (reporting customer whose driving data was collected by GM and OnStar without his knowledge and shared with his insurance company stated, "It felt like a betrayal . . . They're taking information that I didn't realize was going to be shared and screwing with our insurance").

harvested and shared and/or sold to third parties because GM and OnStar *designed* it that way.

### E. GM and OnStar fail to adequately disclose they collect and share and/or sell customers' driving data with third parties.

26.     The GM and OnStar agreements fail to adequately disclose how the corporations collect and share and/or sell customers' driving data with third parties. GM and OnStar do not adequately disclose to customers, including Plaintiff, that they (i) collect customer driving data, and (ii) share and/or sell that sensitive data to third parties who provide it to auto insurers.

27.     GM's User Terms for Application Services, which incorporates the OnStar user terms and privacy statement, state "[w]e may collect, use, and share information about you, including the location of your Device or Vehicle *as described in the Privacy Statement for Application Services* available at www.onstar.com/privacy." (emphasis added).[31]

28.     In turn, the OnStar User Terms explains that "GM collects, users, and shares information from and about Your and your vehicle. The GM Privacy Statement describes what GM does with that information. *You consent to the collection, use, and sharing of information described in the Privacy Statement*, and

---

[31] General Motors Holdings LLC, *User Terms for Application Services* (last updated Nov. 14, 2022), https://www.onstar.com/content/dam/onstar/na/us/en/index/legal/user-terms-for-applications-servies/02-pdfs/user-terms-for-application-services.pdf (last accessed Apr. 30, 2024).

any revisions to the Privacy Statement, which may be modified as described in this document." (emphasis added).[32]

29.     One layer deeper, OnStar includes a supplemental privacy statement for application services where it explains that OnStar collects and treats "information from you as described in the OnStar Privacy Statement."[33]

30.     The *only* reference to sharing data with third parties in the OnStar Privacy Statement that even remotely relates to Defendants' practice at issue here is the following:

> "[OnStar] may also share data with third parties . . . where you have elected to receive a service from them and/or authorized them to request data from GM (for example, financial organizations who offer financing for the purchase or lease of GM vehicles *or usage based insurance providers*).

(emphasis added).[34] But this single sentence in the OnStar Privacy Statement— which is buried in a "drop down" that a user must toggle to reveal from its default hidden status—provides no basis for the conduct at issue in the instant suit.

---

[32] General Motors Holdings LLC, *User Terms for Connected Vehicle Services* (last updated May 1, 2018), https://www.onstar.com/legal/user-terms (last accessed Apr. 30, 2024).

[33] General Motors Holdings LLC, *Privacy Statement for Application Services* (last updated May 1, 2022), https://www.onstar.com/content/dam/onstar/na/us/en/index/legal/legal-privacy-statement-jan012011/02-pdfs/Privacy-Statement-for-Application-Services.pdf.html (last accessed Apr. 30, 2024).

[34] *General Motors U.S. Connected Services Privacy Statement* (last updated July 1, 2023), https://www.onstar.com/legal/privacy-statement (last accessed Apr. 30, 2024).

31.    By its own terms, the OnStar Privacy Statement only allows OnStar to share data with third parties (in this case LexisNexis Risk Solutions and auto insurance companies) where the driver has *elected* to receive a service from those specific third parties and/or *authorized* those specific third parties to request data from GM.

32.    Plaintiff did not elect to receive *any* service from LexisNexis Risk Solutions, let alone a service in which LexisNexis compiles their every driving move and provides that report to their car insurance providers against Plaintiff's interest. Bound by its own terms then, GM cannot, through OnStar or otherwise, share data with LexisNexis and car insurance providers from which Plaintiff never elected to receive services.

33.    Neither did Plaintiff authorize LexisNexis Risk Solutions nor their auto insurance providers to request their driving data from GM. Putting aside how GM would even *know* about the private agreements between Plaintiff and third parties such that GM could fairly and accurately confirm whether Plaintiff authorized those third parties to request his driving data from GM, Plaintiff provided no such authorization.

34.    Indeed, even according to GM's own example regarding "usage based insurance providers," GM is only allowed to share drivers' telematics with usage based insurance provides where the drivers "elected" to receive such usage-based

insurance from their insurers and/or "authorized" their insurers to request their driving telematics *from* GM. Plaintiff did no such thing. It's the opposite: Plaintiff is forced to pay higher insurance costs because GM shared his sensitive, private driving telematics without his consent, effectively forcing Plaintiff into usage-based insurance services that he never elected to receive. Even if Plaintiff's insurance providers did request this data, GM breached its agreement because Plaintiff never authorized their car insurance providers to make those data requests in the first place.

35.     GM and OnStar employ a byzantine, multi-platform, cross-referential series of agreements to obfuscate the fact that they collect and share and/or sell customer data in a manner that is both procedurally and substantively unfair to customers, deceptive, and misleading. Plaintiff does not and would never consent to the data harvesting that GM and OnStar engaged in because such practices are not disclosed in the agreements. To the extent such practices are disclosed (they are not), the disclosures are woefully inadequate to inform customers of those practices and do not contemplate—let alone obtain—their consent. Further, *nowhere* do they authorize—the conduct GM engaged in here.

36.     On March 22, 2024, according to a New York Times article, GM announced that two days previously it had "stopped sharing details about how people drove its cars with two data brokers [LexisNexis Risk Solutions and Verisk] that

15

created risk profiles for the insurance industry."[35] A GM spokesperson said in an email statement to the New York Times: "Customer trust is a priority for us, and we are actively evaluating our privacy processes and policies." This change in practices was itself an acknowledgment by Defendants that, although the practice was profitable, they did not have the requisite legal consent to carry it out.

### F. Plaintiff's Experience

37.    Plaintiff Michael Laursen is a resident of Michigan. In or about 2022, he bought a 2020 GMC Sierra. In or about January 2023, he sold the 2020 GMC Sierra and bought a 2023 GMC Sierra.

38.    Plaintiff does not recall activating a subscription to OnStar as to either car.

39.    At no time was Plaintiff aware that the OnStar product was activated, let alone that it was tracking his driving telematics. If he had known the OnStar product was tracking his driving telematics, he would not have knowingly activated the product or paid for a subscription.

40.    Plaintiff was notified by his auto insurer of a sharp increase in his insurance premium.

41.    Plaintiff has never enrolled in a "usage-based" auto insurance program.

---

[35] Kashmir Hill, *General Motors Quits Sharing Driving Behavior with Data Brokers*, The New York Times (Mar. 22, 2024), https://nytimes.com/2024/03/22/technology/gm-onstar-driver-data.html (last accessed Apr. 30, 2024).

42.     Plaintiff had the reasonable expectation and understanding that GM would not be collecting this type of information without his express consent or authorization.

43.     Plaintiff had the reasonable expectation and understanding that GM and OnStar would not share this type of information without his express consent or authorization.

44.     In fact, Plaintiff would not have bought a GM car in the first place had he known about its invasive data harvesting practice described herein.

## CLASS ACTION ALLEGATIONS

45.     Plaintiff brings this class action individually on behalf of himself and on behalf of all members of the following Classes of similarly situated persons pursuant to Federal Rule of Civil Procedure 23. Plaintiff seeks certification under Fed. R. Civ. P. 23(a), (b)(2), and (b)(3) of the following Classes:

> **Nationwide Class:** All persons residing in the United States who within the applicable statute of limitations had their vehicle's driving data collected and shared with a third party without their consent.

> **Michigan Class:** All persons residing in Michigan who within the applicable statute of limitations had their vehicle's driving data collected and shared with a third party without their consent.

46.     Excluded from the Classes are Defendants and their affiliates, parents, subsidiaries, officers, agents, and directors, any entities in which Defendants have a controlling interest, as well as the judge(s) presiding over this matter and the clerks,

judicial staff, and immediate family members of said judge(s).

47.     Plaintiff reserves the right to modify or amend the foregoing Classes definitions before the Court determines whether certification is appropriate.

48.     <u>Numerosity:</u> The members in the Classes are so numerous that joinder of all Class Members in a single proceeding would be impracticable. As noted above, it has been reported that OnStar had 1 million GM subscribers in 2020.

49.     <u>Commonality and Predominance:</u> Common questions of law and fact exist as to all Class Members and predominate over any potential questions affecting only individual Class Members. These common questions of law or fact include, *inter alia*:

    a.    Whether Defendants collected Plaintiff's and Class Members' driving telematics data;

    b.    Whether Plaintiff and Class Members knowingly consented to have the data shared with third parties;

    c.    Whether Defendants' practices are an invasion of privacy;

    d.    Whether Defendants' practices are unfair and/or deceptive;

    e.    Whether Defendant's conduct was knowing and willful;

    f.    Whether Defendants' contracts were uniformly misleading in a way; and

g. Whether Plaintiff and Class Members are entitled to actual and/or statutory damages, and the measure of such damages.

50. Defendants engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiff on behalf of themselves and all other Class Members. Individual questions, if any, pale in comparison, in both quantity and quality, to the numerous common questions that dominate this action.

51. Typicality: Plaintiff's claims are typical of the claims of the Classes. Plaintiff, like all proposed Class Members, had their driving telematics data collected and shared with third parties without consent. Plaintiff and Class Members were injured by the same wrongful acts, practices, and omissions committed by Defendants, as described herein. Plaintiff's claims therefore arise from the same practices or course of conduct that give rise to the claims of all Class Members.

52. Adequacy: Plaintiff will fairly and adequately protect the interests of the Class Members. Plaintiff is an adequate representative of the Classes and has no interests adverse to, or conflict with, the class(es) he seeks to represent. Plaintiff has retained counsel with substantial experience and success in the prosecution of complex customer protection class actions of this nature.

53. Superiority: A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages and

other financial detriment suffered by Plaintiff and all other Class Members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendants, so it would be impracticable for Class Members to individually seek redress from Defendants' wrongful conduct. Even if Class Members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## CAUSES OF ACTION

### COUNT I
### INVASION OF PRIVACY
**(On Behalf of Plaintiff and the Nationwide Class)**

54.     Plaintiff realleges and incorporate by reference the allegations contained in paragraphs 1 through 53 above, as if fully set forth herein.

55.     Plaintiff and Class Members have a common law, legally protected privacy interest in their driving telematics data and are entitled to the protection of their information and property against unauthorized access.

56.     Plaintiff and Class Members reasonably expected their driving telematics data would not be collected by GM and shared with third parties without their express consent.

57.     GM unlawfully invaded the privacy rights of Plaintiff and Class Members by: (a) collecting their driving telematics data in a manner that is highly offensive to a reasonable person; and (b) disclosing their driving telematics data to unauthorized parties without the informed and clear consent of Plaintiff and Class Members.

58.     In intentionally sharing Plaintiff and Class Members' Personal Information, GM acted in reckless disregard of their privacy rights, intruded into their seclusion, and publicly disclosed their private data.

59.     As a direct and proximate result of GM's unlawful invasions of privacy, Plaintiff and Class Members' private, personal, and confidential information has been accessed or is at imminent risk of being accessed, and their reasonable expectations of privacy have been intruded upon and frustrated. Plaintiff and Class Members have suffered injuries as a result of GM's unlawful invasions of privacy and are entitled to appropriate relief.

60.     Plaintiff and Class Members are entitled to actual damages, punitive damages, and compensatory damages for invasion of their privacy in an amount to be determined by a jury at trial.

## COUNT II
### MICHIGAN CONSUMER PROTECTION ACT
### Mich. Comp. Laws Ann. §§ 445.903 *et seq.*
### (On Behalf of Plaintiff and the Michigan Class)

61.    Plaintiff realleges and incorporates by reference the allegations contained in paragraphs 1 through 53 above, as if fully set forth herein.

62.    Plaintiff brings this claim on behalf of himself and the Michigan Class.

63.    Defendants are "persons" as defined by Cal. Bus. & Prof. Code § 17201.

64.    Defendants violated Mich. Comp. Laws Ann. §§ 445.903 *et seq*. ("CPA") by engaging in unlawful, unfair, and deceptive business acts and practices.

65.    Defendants has engaged in "unfair, unconscionable, or deceptive" business practices by violating Michigan common law and statutory duties, and by surreptitiously tracking Plaintiff's and Class Members' driving events to sell that information for a profit to insurance companies – to the detriment and expense of Plaintiff and Class Members.

66.    Defendants' representations and omissions were material because they were likely to deceive reasonable consumers about the true function and purposes of Defendants' data collection.

67.    As a direct and proximate result of Defendants' unfair, unlawful, and fraudulent acts and practices, Plaintiff and Michigan Class Members were injured and suffered damages, as alleged herein, including but not limited to invasion of

22

privacy; overpayment for auto insurance services; and decreased value of their driving telematics data.

68.    Defendants acted intentionally, knowingly, and maliciously to violate the CPA, and recklessly disregarded Plaintiff's and Michigan Class Members' rights.

69.    Plaintiff and Michigan Class Members seek all monetary relief allowed by law, including all actual damages stemming from Defendants' unfair, unlawful, and fraudulent business practices and reasonable attorneys' fees and costs under Mich. Comp. Laws Ann. §§ 445.910-911.

## PRAYER FOR RELIEF

Plaintiff, individually and on behalf of all other Class Members, respectfully requests that the Court enter judgment in Plaintiff's favor and against Defendants as follows:

A.    Certifying the Classes as requested herein, designating Plaintiff as Class representative, and appointing Plaintiff's counsel as Class Counsel;

B.    Awarding Plaintiff and the Classes appropriate monetary relief, including actual damages, statutory damages, and punitive damages;

C.    Awarding Plaintiff and the Classes pre-judgment and post-judgment interest to the maximum extent allowable;

D.    Awarding Plaintiff and the Classes reasonable attorneys' fees, costs, and expenses, as allowable; and,

E.    Awarding Plaintiff and the Classes such other favorable relief as allowable under law.

## **JURY DEMAND**

Plaintiff hereby demands a trial by jury for all claims so triable.

Date: April 30, 2024.                    Respectfully submitted,

*/s/ Terence R. Coates*
Terence R. Coates (Ohio Reg. No. 85579)
**MARKOVITS, STOCK & DEMARCO, LLC**
119 East Court Street, Suite 530
Cincinnati, OH 45202
Telephone: (513) 651-3700
Facsimile: (513) 665-0219
tcoates@msdlegal.com

Joseph M. Lyon (Ohio Reg. No. 76050)
Kevin M. Cox (Ohio Reg. No. 99584)*
**THE LYON FIRM**
2754 Erie Ave.
Cincinnati, OH 45208
Tel: (513) 766-9011
jlyon@thelyonfirm.com
kcox@thelyonfirm.com

*\* Application for admission forthcoming*

24